UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BANK OF AMERICA, N.A.                          CIVIL ACTION

VERSUS                                         NO: 15-1386

GARDEN DISTRICT PET HOSPITAL,                  SECTION: R
INC., ET AL.

## ORDER AND REASONS

Plaintiff Bank of America moves the Court for summary judgment against defendants Garden District Pet Hospital, Inc., Scott Griffith, and The French Quarter Vet, Inc.[1]  For the following reasons, the Court grants in part and denies in part the motion.

## I.    BACKGROUND

In this lawsuit, plaintiff Bank of America seeks to collect amounts unpaid under a loan it extended to Garden District Pet Hospital, Inc.  Bank of America seeks to recover from several defendants in different capacities.  Specifically, it has sued Garden District, Inc. as the defaulting borrower, Scott Griffith as the borrower's guarantor, and a second corporation, The French Quarter Vet, Inc., as an alleged corporate successor of Garden District, Inc.[2]

---

[1] R. Doc. 11.

[2] R. Doc. 1.

### A.    The Finance Agreement

On September 18, 2009, Bank of America executed a Project Finance Term Loan Agreement (the "Finance Agreement") in favor of a borrower identified as "Garden District Pet Hospital."[3]   By its terms, the Finance Agreement includes a promissory note, a security agreement, and a guaranty agreement, "all of which are to be construed together and are binding on the parties."[4]   The Finance Agreement provides that Bank of America will make advances to the borrower of up to $350,000 for the purpose of financing the development, establishment, and operation of the borrower's veterinary practice.[5] It also contemplates a "Project Closing Date," at which point the advances are converted into a permanent loan, which must be repaid in monthly installments.[6]  Several events of default are specified in the Finance Agreement, including "the failure to make any payment of the Indebtedness," which "continues for 10 days after it first becomes due."[7]    The Finance Agreement also contains an acceleration clause, which provides that in the

---

[3] R. Doc. 11-4.

[4] *Id.* at 1.

[5] R. Doc. 11-4 at 2, 11; R. Doc. 18 at 7.

[6] R. Doc. 11-4 at 2.

[7] *Id.* at 5.

2

event of default, Bank of America has the option to declare all remaining amounts due under the Finance Agreement immediately due and payable, charge interest at the default rate, and exercise all of Bank of America's rights as a secured party.[8]   Scott Griffith signed the Finance Agreement as the borrower's authorized representative.[9]

In connection with the Finance Agreement, Griffith also executed a continuing guaranty agreement, in which he absolutely, unconditionally, and irrevocably guaranteed the borrower's obligations.  The agreement provides, in relevant part:

> Each Guarantor absolutely, unconditionally, jointly and severally guarantees the prompt payment when due of all Indebtedness.  If Borrower fails to pay all or part of any Indebtedness when due, Guarantor shall immediately pay to Lender the outstanding balance of all Indebtedness, regardless of whether or not Lender first pursues Borrower or exhausts any of its rights or remedies against Borrower, the Collateral, or other Security.[10]

It further provides that "[t]his is a continuing guaranty and may not be terminated or revoked by Guarantor unless and until all Indebtedness to Lender has been indefeasibly paid in full in cash. . . ."[11]

---

[8] *Id.* at 6.

[9] *Id.* at 12.

[10] *Id.* at 13.

[11] *Id.*

Also, under the Finance Agreement, the borrower granted Bank of America "a security interest in the Collateral and proceeds of the Collateral to secure payment and performance of the Indebtedness."[12]   The Finance Agreement defines "Collateral" as "all of the business personal and business assets of Borrower, and, if applicable, any Guarantor, wherever located, and now owned or hereafter acquired. . . ."[13]   Bank of America perfected the security interest by filing a UCC Financing Statement in 2009.[14]

As to the identity of the borrower, the Finance Agreement provides, in a box labeled "BORROWER: Legal Name," that the borrower is "Garden District Pet Hospital."[15]   In separate box, the Finance Agreement lists the borrower's "type of organization" as "limited liability company."[16]   It also lists the borrower's address as "1116 Louisiana Avenue, Unit 4, New Orleans, LA 70115."[17]   It is undisputed that when the Finance Agreement was executed, Griffith was associated with two entities using the "Garden District Pet Hospital" name.  The first was a limited liability company, Garden District Pet

---

[12] *Id.* at 3.

[13] *Id.* at 10.

[14] R. Doc. 1-3.

[15] R. Doc. 11-4 at 1.

[16] *Id.*

[17] *Id.*

Hospital, LLC ("Garden District, LLC").[18] Although neither party has provided information on the nature of Garden District, LLC's business, records from the Louisiana Secretary of State indicate that the company maintained its business address at 809 Marengo Street, New Orleans, Louisiana 70115.[19] The second entity was a corporation, Garden District Pet Hospital, Inc. ("Garden District, Inc."), of which Griffith was the sole shareholder, director, and corporate officer.[20] During his deposition, Griffith testified that Garden District, Inc. operated a small animal clinic at the address listed in the Finance Agreement, 1116 Louisiana Avenue, Unit 4, New Orleans, Louisiana 70115.[21]

In October 2009, approximately one month after the Finance Agreement was executed, Griffith and Bank of America executed a second document, titled "Change Notification and Acknowledgment" (the "Change Agreement").[22] The Change Agreement states that its purpose is to "change[], amend[] and modif[y] the Project Finance and Term Loan Agreement

---

[18] R. Doc. 18 at 6.

[19] R. Doc. 17-1.  Garden District, LLC was organized in November 2006 as Vibrational Prosperity, LLC.  It changed its name to Garden District Pet Hospital, LLC in August 2009 and subsequently changed its name to Marengo Lilies, LLC in October 2009.  The Louisiana Secretary of State revoked its articles of organization in 2012.

[20] R. Doc. 18 at 6, 9-10.

[21] R. Doc. 11-5 at 5, 9.

[22] R. Doc. 14-2 at 4.

('Finance Agreement') between Bank of America, N.A. ('Lender') and Garden District Pet Hospital, Inc. ('Borrower')."[23] Specifically, the Change Agreement provides that the borrower's type of organization is changed from "limited liability company" to "corporation," while the borrower's legal name is changed from "Garden District Pet Hospital, LLC" to "Garden District Pet Hospital, Inc."[24] It further provides that "[e]xcept as modified by this Change Agreement, all other terms and conditions of the Finance Agreement, and any other documents or instruments executed in connection with it, shall remain unchanged and in full force and effect."[25] Griffith signed the Change Agreement in his capacity as Garden District, Inc.'s representative.[26]

On April 20, 2010, Bank of America's project advances under the Finance Agreement were converted into a permanent loan in the principal amount of $366,729.95 with a term of 60 months and a fixed interest rate of 7.15 percent. On that date, Bank of America and Griffith, on behalf of Garden

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

District, Inc., executed a "Final Disbursement, Change, and Repayment Schedule," setting forth the terms of the final loan.[27]

## B.    Default

After the Finance Agreement loan became permanent, the small animal clinic operated by Garden District, Inc. failed, and the company went out of business.  Garden District, Inc. has since been dissolved as a corporation.[28]  It is undisputed that Garden District, Inc. defaulted under the Finance Agreement by failing to pay the monthly installment due on January 1, 2015 and each payment due since that date.[29]  It is also undisputed that Bank of America provided Garden District, Inc. and the guarantor a written notice of default and an opportunity to cure.[30]  No payments were made, and Bank of America accelerated all sums due under the Finance Agreement.[31]

## C.    Litigation

On April 28, 2015, Bank of America filed this lawsuit, seeking both collection of unpaid sums and a judgment recognizing the validity and

---

[27] R. Doc. 1-2.

[28] R. Doc. 18 at 6.

[29] *Id.* at 8.

[30] *Id.*

[31] *Id.* at 9.

enforceability of the security interest granted by the Finance Agreement.[32] Bank of America named as defendants Griffith, Garden District, Inc., and a second corporation, The French Quarter Vet, Inc. ("French Quarter, Inc."). According to Bank of America, French Quarter, Inc. is liable for Garden District, Inc.'s debt under the Finance Agreement because it is a successor corporation and mere continuation of Garden District, Inc.

Bank of America now moves for summary judgment against all three defendants. All parties agree that Garden District, Inc. is liable to Bank of America as the defaulting borrower under the Finance Agreement.[33] In a listing of uncontested facts filed with the Court, the parties submit that, as of January 28, 2016, the balance due under the Finance Agreement is as follows:

| | |
|---|---|
| Unpaid Principal | $288,798.55 |
| Interest | $23,918.53 |
| Late Fees | $5,299.32 |
| **Total** | **$318,016.40** |

plus interest accruing at the daily rate of $57.36, together with late charges, attorneys' fees and costs that accrued as of January 28, 2016, and that continue to accrue thereafter, until all obligations

---

[32] R. Doc. 1.

[33] R. Doc. 18 at 9.

of Borrower and Guarantor to Bank of America under the [Finance] Agreement are paid in full.[34]

Bank of America contends that, under the terms of the Finance Agreement, Griffith is also liable to Bank America as Garden District, Inc.'s guarantor.  Griffith contends that he is not liable because he agreed only to guaranty the debt of the entity named in the September 18, 2009 contract, Garden District, LLC.[35]  According to Griffith, the October 2009 Change Agreement extinguished that debt and replaced it with a new debt owed by a different entity, Garden District, Inc.  In other words, Griffith contends that the Change Agreement was a subjective novation, in which Bank of America agreed to discharge one borrower, whose debts Griffith had guaranteed, and substitute in its place a new, unsecured borrower, Garden District, Inc.  In support, Griffith submits an affidavit, in which he states that he entered the Finance Agreement on behalf of Garden District, LLC and that "he at no time agreed to personally guarantee the debt of Garden District Pet Hospital, Inc."[36]

Bank of America argues that the Change Notification was not intended to effect a subjective novation.  Rather, its purpose was to correct a clerical

---

[34] *Id.* at 10.

[35] R. Doc. 14 at 3-4.

[36] R. Doc. 14-2 at 1-2.  Griffith's deposition occurred on January 21, 2016, and his affidavit is dated February 8, 2016.

error in the written Finance Agreement, which mistakenly identified the borrower as a limited liability company when it was, in fact, a corporation.[37] Thus, Bank of America's position is that all parties to the Finance Agreement intended Garden District Hospital, Inc. to be the borrower, that the written contract executed on September 18, 2009 failed to reflect this agreement, and that the Change Agreement modified the written contract to reflect the parties' true intent.  In support, Bank of America submits the affidavit a Bank of America official familiar with the loan, who states that Bank of America entered the Finance Agreement with Garden District, Inc., with Griffith acting as guarantor.[38]  Bank of America also cites Griffith's deposition testimony. Testifying on behalf of Garden District, Inc.--and, notably, not as a representative of Garden District, LLC--Griffith testified as follows:

> Q.   Now, in 2009, did Garden District Pet Hospital, Inc. obtain a loan from Bank of America.
>
> A.   Yes.
>
> Q.   And what was the purpose of that loan?
>
> A.   To establish a practice, renovate, purchase equipment, and establish a build-out for the clinic. . . .

---

[37] R. Doc. 17 at 2.

[38] R. Doc. 11-3 at 1.

Q.    And did you personally guarantee the debt of the borrowing
      entity, Garden District Pet Hospital?

A.    Yes.[39]

As to the second corporation, French Quarter, Inc., Bank of America contends that it is liable for Garden District, Inc.'s debt under the successor corporation doctrine.   According to Bank of America, the circumstances surrounding French Quarter, Inc.'s creation suggest that it is a mere continuation of Garden District, Inc.  During his deposition, Griffith testified that French Quarter, Inc. was formed in December 2011.[40]  As with Garden District, Inc., Griffith was and remains French Quarter, Inc's sole shareholder, director, and officer.[41] Griffith testified that while both corporations operated a small animal clinic/hospital, they operated in under different names and in different physical locations.[42]  Moreover, due to the distance between the facilities, the animal clinics served different sets of clients.[43]  Griffith further testified that both corporations employed him as a veterinarian and his son as

---

[39] R. Doc. 11-5 at 9.

[40] *Id.* at 14.

[41] *Id.* at 14-15.

[42] *Id.* at 15-16.

[43] *Id.* at 16.

11

a practice manager.[44]  Otherwise, the corporations did not have any common

employees.[45]  Griffith also testified that although Garden District, Inc. is no

longer in business, French Quarter, Inc. has its own physical assets and does

not employ any of the equipment previously used by Garden District, Inc.[46]


## II.    LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*,

477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075

(5th Cir. 1994).  When assessing whether a dispute as to any material fact

exists, the Court considers "all of the evidence in the record but refrains from

making credibility determinations or weighing the evidence."  *Delta & Pine

Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–399 (5th

Cir. 2008).  The Court must draw reasonable inferences in favor of the

nonmoving party, but "unsupported allegations or affidavits setting forth

'ultimate or conclusory facts and conclusions of law' are insufficient to either

---

[44] *Id.* at 16-19.

[45] *Id.* at 18; R. Doc. 18 at 10 ("French Quarter Vet did not have the same employees as Garden District Inc. with the exception of Dr. Griffith and Lee Griffith.").

[46] *Id.* at 19.

support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 2738 (2d ed.1983)).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence that would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991) (quotation marks removed).  The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324.

The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *Id.*; *see also Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'") (quoting *Celotex*, 477 U.S. at 322).

## III.   DISCUSSION

### A.   Choice of Law

The parties do not dispute the issue of choice of law.  The Finance Agreement contains a choice of law provision, which states that the agreement and "all matters arising out of, resulting from or in any way connected with this Agreement" shall be governed by "the internal laws of the State of the Borrower's principal place of business"--in this case, Louisiana.[47] Accordingly, the Court applies Louisiana law.  *See* La. Civ. Code art. 3540.

### B.   Garden District, Inc.'s Liability As Borrower

Bank of America moves for summary judgment against Garden District, Inc., Griffith, and French Quarter, Inc. for amounts due under the Finance

---

[47] R. Doc. 11-4 at 8.

14

Agreement.  Bank of America asserts that the balance due under the Finance Agreement as of January 28, 2016 is $318,016.40, that late fees and interest continue to accrue, and that defendants also owe attorney's fees and costs. Garden District, Inc. admits that it is liable under the Finance Agreement to Bank of America for the amounts asserted by Bank of America.[48]  The record contains no evidence to challenge Garden District, Inc.'s liability.  Accordingly, the Court grants Bank of America's motion for summary judgment against Garden District, Inc.  Also, because no party has challenged the validity of the security interest granted by the Finance Agreement and perfected by Bank of America, the Court grants Bank of America's motion for summary judgment on that issue as well.

---

[48] R. Doc. 18 at 4, 6, 8-9.

15

### C.    Griffith's Liability As Guarantor

Next, the Court considers Griffith's liability as a guarantor under the Finance Agreement.  Although Griffith does not dispute that he executed the September 18, 2009 Finance Agreement as a guarantor, he contends that the guaranty is no longer in effect.  In support, Griffith relies on the October 2009 Change Agreement, which amended the Finance Agreement by changing the borrower's legal name from "Garden District Pet Hospital, LLC" to "Garden District Pet Hospital, Inc."  Griffith contends that the Change Agreement was, in effect, a subjective novation of the original Finance Agreement, which extinguished the debt owed by one entity, Garden District, LLC, and substituted in its place, a new debt owed by a different entity, Garden District, Inc.  Griffith argues that he did not guarantee Garden District, Inc.'s debt, and he is therefore not liable for its indebtedness.  Bank of America argues that the Change Agreement's purpose was to correct a clerical error in the written Finance Agreement, which mistakenly identified the borrower as a limited liability company when it was, in fact, a corporation.

Under Louisiana law, "[n]ovation is the extinguishment of an existing obligation by the substitution of a new one."  La. Civ. Code art. 1879.  A subjective novation--the variety alleged by Griffith--occurs when "a new obligor is substituted for a prior obligor who is discharged by the obligee."  La.

16

Civ. Code art. 1882.  The most important factor in determining whether a novation has occurred is the intent of the parties.  *Scott v. Bank of Coushatta*, 512 So.2d 356, 360 (La. 1987).  The intention to effect a novation may be shown by the character of the transaction, the facts and circumstances surrounding the transaction, as well as the terms of the agreement itself.  *Id.*; *Wainer v. A.J. Equities, Ltd.*, 984 F.2d 679, 683 (5th Cir. 1993).  A novation, however, may never be presumed, and "the intention to extinguish the original obligation must be clear and unequivocal."  La. Civ. Code art. 1880.  The burden of proving a novation is on the party seeking its protection.  *Scott*, 512 So. 2d at 360; *Ciolino v. First Guar. Bank*, 133 So. 3d 686, 691 (La. App. 1st Cir. 2013).

Here, the language of the Change Agreement does not demonstrate an unequivocal intention to effect a novation.  As an initial matter, the term "novation" does not appear anywhere in the agreement.  Nor does the agreement state that one borrower has been substituted for the other, that any existing obligations have been extinguished, or that any new obligations have been created by the agreement's execution.   Instead, the language provides that the Change Agreement "modifies the Project Finance and Term Loan Agreement ('Finance Agreement') between Bank of America, N.A. ('Lender')

17

and Garden District Pet Hospital, Inc. ('Borrower')."[49]  It further provides that "[e]xcept as modified by this Change Agreement, all other terms and conditions of the Finance Agreement . . . shall remain unchanged and in full force and effect."[50]  Nothing in this language suggests that the parties intended to extinguish the original Finance Agreement and replace it with a new agreement involving a new borrower.  *Cf. Harris v. S. Fid. Ins. Co.*, No. CIV.A. 09-6631, 2010 WL 323561, at *2 (E.D. La. Jan. 21, 2010) (finding novation when insurer informed policyholder that a different company had assumed full responsibility for the insurer's obligations under the policy and expressly indicated that the assumption of liability was intended to be a novation). Rather, it suggests that the parties intended to modify the *already existing* Finance Agreement between Bank of America and Garden District, Inc. by amending the written contract to reflect the borrower's actual business structure.  Thus, the Change Agreement's text supports Bank of America's contention that Garden District, Inc. was the original borrower and that the Change Agreement merely fixed a clerical error in the written contract, leaving all other terms, including Griffith's guaranty, in "full force and effect."

---

[49] R. Doc. 14-2 at 4.

[50] *Id.*

18

Further, the nature of the parties' agreement and the surrounding circumstances dispel any notion that the parties intended the Change Agreement to effect a novation.  As Griffith acknowledges, the purpose of the loans made under the Finance Agreement was to finance the development and operation of the borrower's veterinary practice.[51]   The original Finance Agreement states that the address of the intended borrower--and, hence, the location of the recipient veterinary practice--is 1116 Louisiana Avenue, Unit 4, New Orleans, Louisiana 70115.[52]  During his deposition, Griffith testified that the animal clinic located at that address was operated by Garden District , Inc.[53]  By contrast, records from the Louisiana Secretary of State indicate that the Garden District, LLC maintained its business address at 809 Marengo Street, New Orleans, Louisiana 70115.[54]  This discrepancy suggests that, although the original contract described the borrower as a limited liability company, the parties--including Griffith as guarantor--intended the Finance Agreement loans to benefit Garden District, Inc.  Griffith himself testified to this effect during his deposition.  When asked whether "Garden District Pet

---

[51] R. Doc. 11-4 at 2, 11; R. Doc. 18 at 7.

[52] R. Doc. 11-4 at 1.

[53] R. Doc. 11-5 at 5, 9.

[54] R. Doc. 17-1.

Hospital, Inc. obtain[ed] a loan from Bank of America" in 2009, Griffith testified, "yes."[55]  When asked whether he "personally guarantee[d] the debt of the borrowing entity," Griffith testified that he had.[56]

Nonetheless, Griffith argues that his affidavit creates a fact issue as to the parties' intent to novate, thereby precluding summary judgment.  In his affidavit, Griffith states--directly contrary to his deposition testimony--that he "at no time agreed to personally guarantee the debt of Garden District Pet Hospital, Inc."[57]  This conclusory statement does not raise a genuine issue of fact concerning the parties' intent.  *See Biscuit Investments, Inc. v. Cajun Enterprises, Inc.*, No. CIV. A. 89-2778, 1994 WL 160494, at *4 (E.D. La. Apr. 22, 1994) ("While intent is the determinative factor in deciding whether the parties effected a novation, the Court does not find that AFC's self-serving, conclusory and post hoc affidavit raises a genuine issue as to the parties' intent.").

In sum, neither the terms of the Finance Agreement and Change Notification, nor the circumstances surrounding their execution support Griffith's assertion that the parties intended a novation.  This is particularly

---

[55] R. Doc. 11-5 at 9.

[56] *Id.*

[57] R. Doc. 14-2 at 1.

20

true given that, for Bank of America, a novation would have replaced a debt secured by Griffith's absolute, unconditional, and irrevocable guarantee with a debt owed by a different entity and lacking any comparable security. Griffith has provided no evidence to suggest that Bank of America intended a routine contract modification form to effect such a result. *See Ciolino*, 133 So. 3d at 691 (noting that courts should not presume a novation because "creditors are not in the business of releasing debtors who have not paid"); *First Nat. Bank of Abbeville v. Greene*, 612 So. 2d 759, 763 (La. Ct. App. 3 Cir. 1992) ("It is not reasonable to believe the Bank intended to substitute an unsecured debt for one secured by collateral mortgage notes and personal guarantees."). The Court therefore finds that Bank of America is entitled to judgment against Griffith as a matter of law. Griffith is liable to Bank of America as guarantor for Garden District, Inc.'s indebtedness.

## D.   French Quarter, Inc.'s Liability As A Successor Corporation

Finally, the Court turns to the alleged liability of French Quarter, Inc. Bank of America argues that French Quarter, Inc. is liable for the obligations of Garden District, Inc. under the corporate successor doctrine. According to Bank of America, French Quarter, Inc. is a mere continuation of Garden District, Inc. because Griffith is the sole shareholder, director, and officer of

both corporations, both corporations operated a small animal clinic, and both shared two employees, Griffith and his son.

      To support its contention that these circumstances give rise to successor liability, Bank of America cites *Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379 (5th Cir. 2000). There, the Fifth Circuit, applying Louisiana law, held that a corporation that acquires the assets of another is liable for the debts of the old corporation when "circumstances attending the creation of the new [corporation] . . . were of such a character as to warrant the finding that the new, is merely a continuation of the old, corporation." *Id.* at 390. The purpose of this "mere continuation" exception to the rule of non-liability is to "prevent[] two corporations from merging in effect while limiting the liability of the surviving corporation by structuring the transaction as a sale of assets." *Murray v. B&R Mach. 95073937*, No. CIV. A. 92-4030, 1995 WL 133346, at *4 (E.D. La. Mar. 24, 1995) (citing *Bourque v. Lehmann Lathe, Inc.*, 476 So.2d 1125, 1127 (La. Ct. App. 3 Cir. 1985)). Accordingly, as Louisiana court have noted, "[a] threshold requirement to trigger a determination of whether successor liability is applicable under the 'continuation' exception is that one corporation must have purchased all or substantially all of the assets of another." *See J.D. Fields & Co. v. Nottingham Const. Co., LLC*, 2015-0723, 2015 WL 6875153, at *7 (La. App. 1 Cir. 2015); *Pichon v. Asbestos Defendants*,

52 So. 3d 240, 244 (La. App. 4 Cir. 2010) (same); *see also Comardelle v. Pennsylvania Gen. Ins. Co.*, No. CIV.A. 13-6555, 2014 WL 7139436, at *3 n. 31 (E.D. La. Dec. 15, 2014) (doubting that successor liability doctrine applied when predecessor corporation did not sell substantially all of its assets to alleged successor).

Here, although Bank of America identifies certain commonalities between French Quarter, Inc. and Garden District, Inc., it has produced no evidence of an asset purchase.  To the contrary, Griffith testified during his deposition that the two corporations operated animal clinics in different locations, using different sets of equipment.  He further testified that French Quarter, Inc. did not acquire any physical assets from Garden District, Inc. when that corporation went out of business.[58]  Accordingly, Bank of America has failed to establish that the doctrine of successor liability has any relevance to this case.  *See J.D. Fields*, 2015 WL 6875153, at *7; *Pichon*, 52 So. 3d at 244.

Even if Bank of America could clear this hurdle, however, the record does not reveal the level of closeness of identity required to impose liability on French Quarter, Vet. for Garden District, Inc.'s indebtedness. The Fifth Circuit recognizes eight factors that are probative of whether a successor corporation is a "mere continuation" of the predecessor: (1) retention of the same

---

[58] R. Doc. 11-5 at 19.

employees; (2) retention of the same supervisory personnel; (3) retention of the same production facility in the same physical location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as the continuation of the previous enterprise.  *Russell v. SunAmerica Sec., Inc.*, 962 F.2d 1169, 1176 n. 2 (5th Cir. 1992).  While it is true that French Quarter, Inc. and Garden District, Inc. have a common shareholder, director, and officer, that is only one factor in the analysis.  *See J.D. Fields*, 2015 WL 6875153, at *7; *see also Bona Fide Demolition & Recovery, LLC v. Crosby Const. Co. of Louisiana*, 690 F. Supp. 2d 435, 443 (E.D. La. 2010) (noting that "[c]orporations function as distinct legal entities, separate from the individuals who own them, and their shareholders are not generally liable for the debts of the corporation").  During his deposition, Griffith testified that French Quarter, Inc. operates its animal clinic at a different location than was used by Garden District, Inc.  He further testified that the two animal clinics had different names and--due to the distance between them--served different clienteles.  Moreover, while both animal clinics employed Griffith and his son, Griffith testified that French Quarter, Inc. has had "eight to ten" employees since it opened for business. [59] Other

---

[59] R. Doc. 11-5 at 16.

than the Griffiths, none of those employees worked for Garden District, Inc. for any period of time.

This case is therefore distinguishable from the primary case upon which Bank of America relies, *Munive v. Chet Morrison Offshore, LLC*, No. CIV.A. 06-11203, 2008 WL 544183, at *4 (E.D. La. Feb. 25, 2008). There, the court found on a motion for summary judgment that a limited liability company that purchased the assets of a corporation was a mere continuation of the corporation. The court reasoned that the successor company operated in the same location as its predecessor, used the same facilities, operated under a similar name, retained many of the same personnel, and conducted the same business for the same set of customers. Here, by contrast, the two corporations operate in different locations, have few common employees, use different names, and serve different clienteles. Many of the relevant factors therefore weigh against a finding that French Quarter, Inc. is a mere continuation of Garden District, Inc.

For these reasons, Bank of America's motion for summary judgment against French Quarter, Inc. is denied.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART plaintiff's motion.  The Court GRANTS summary judgment to Bank of America on Garden District, Inc's and Griffith's liability and DENIES Bank of America's motion for summary judgment on French Quarter, Inc.'s liability.


New Orleans, Louisiana, this <u>14th</u> day of March, 2016.


_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE